**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CHARLTON E. BELL,

            Plaintiff,

v.                                        Case No. 3:09-cv-406-J-32MCR

ATLANTIC TRUCKING COMPANY,
INC., et al.,

            Defendant.
_____/

## **ORDER**

Before the Court is Defendant Atlantic Trucking Company's ("Atlantic Trucking") and Defendant Ted Sparks's ("Sparks") (collectively "Defendants") Motion to Dismiss Plaintiff's Amended Complaint or, in the alternative, to Compel Arbitration and Stay Proceedings. (Doc. No. 8; filed June 25, 2009.) Plaintiff Charlton Bell ("Bell") filed his Response in Opposition (Doc. No. 10; filed July 7, 2009), and Defendants replied (Doc. No. 13; filed July 9, 2009). The Court held oral argument on October 26, 2009, the record of which is incorporated by reference.

I.

A.

Bell is an African American who drives a truck for a living. Sometime around October 2, 2002, he entered into a written contract (the "Contract" or "Agreement") with Atlantic Trucking, a motor carrier business, to provide driving services. (Compl. at ¶¶ 7, 8, 9.) The Agreement was styled, "Independent Contractor Agreement," (Id. at ¶ 7), and contained a "no forced dispatch clause," which provided Bell "the right to refuse acceptance of any particular shipment tendered to

[him] for servicing which [he] may deem to be inconvenient or not economical for [his] services" (Compl., Ex. A at 2). The Contract also included an arbitration clause, which provided as follows:

> In the event any controversy or claim arising out of or relating to this agreement cannot be settle[d] by the parties or their legal representatives, such controversy or claim shall be settle[d] by arbitration in South Carolina in accordance with the then current rules of the American Arbitration Association, and the arbitrator's decision shall be final and binding.

(Id. at 8.)

On March 24, 2009, an agent of Atlantic Trucking contacted Bell and requested he pick up a shipment from a company located in Daytona Beach. (Compl. ¶ 11.) Because of the shipment's size, the Daytona Beach company requested a "high cube container." (Id. at ¶ 12.) On March 25, 2009, after agreeing to pick up the shipment, Bell drove his truck to the Jacksonville port to acquire a high cube container but was told that none were available. (Id.) Bell contacted the Atlantic Trucking agent and informed the agent that he could not procure a high cube container for the Daytona Beach shipment. (Id. at ¶ 13.) The agent instructed Bell to ignore the Daytona Beach company's request for a high cube container and, instead, appropriate a standard size container and transport it to the Daytona Beach company for the pick up. (Id. at ¶ 14.) Bell complied with these directions, but when Bell arrived at his destination, agents for the Daytona Beach company refused to load the shipment because, as they had originally informed Atlantic Trucking, the shipment would not fit into a standard size container. (Id. at ¶ 15.) Bell contacted a different agent at Atlantic Trucking and advised the agent of the problem. (Id. at ¶ 16.) The agent for Atlantic Trucking directed Bell to transport the standard size container to Orlando, Florida. (Id.) Bell, however, refused and returned the container to an Atlantic Trucking office—presumably located somewhere in or around Jacksonville. (See id. at ¶ 17.)

When Bell reported to work the next day he was summoned to Ted Sparks's office. (Id. at ¶ 18.) Sparks, who serves as terminal manager for Atlantic Trucking in Jacksonville, told Bell that, because of his failure to follow the company's instructions, he intended to terminate Bell's contract with Atlantic Trucking. (Id. at ¶¶ 19, 20.) On March 30, 2009, Bell received a formal termination letter from Atlantic Trucking. (Id. at ¶ 21.) Bell alleges that before his termination, a white truck driver had refused a request by Atlantic Trucking to pick up and transport a shipment and Sparks did not have that person, or his contract with Atlantic Trucking, terminated. (Id. at ¶ 22.) Similarly, after Bell's termination, a white truck driver refused to take to Orlando the very standard size container that Bell had returned to Atlantic Trucking following the Daytona Beach incident. Sparks did not seek to terminate this driver or his contract with Atlantic Trucking. (Id. at 23.)

B.

On May 5, 2009, Bell filed a Complaint against Atlantic Trucking and Sparks alleging a single count of employment discrimination in violation of 42 U.S.C. § 1981. (Doc. No. 1.) Bell amended his complaint on May 28, 2009 and added a state law count for tortious interference of contract against Sparks.[1] (Doc. No. 4.) Atlantic Trucking and Sparks now move the Court to dismiss the Amended Complaint in favor of arbitration, or, alternatively, compel arbitration.

---

[1] In Count II of his complaint, Bell fails to reveal which state's law he references in devising his tortious interference of contract claim. For purposes of this motion, the Court will assume that Bell relies on Florida law as the source of his claim. See Int'l Funding Corp. v. Krasner, 360 So.2d 1156, 1157 (Fla. 3d DCA 1978) (providing that the elements for a tortious interference of contract claim are (1) existence of a business relationship under which the claimant has legal rights, (2) intentional and unjustified interference with that relationship by defendant, and (3) damage to the claimant as a result of the breach of the business relationship).

3

II.

Motions to compel arbitration are treated generally as motions to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  See Robert Half Int'l, Inc. v.. Thompson, 1999 WL 138849, at *1 (N.D. Ill. Mar. 5, 1999) (citing Evans v. Hudson Coal Co., 165 F.2d 970, 972 (3rd Cir. 1948)).  Such motions come in two varieties:  factual attacks and  facial attacks.  A factual attack challenges "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered."  Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990).  A facial attack, by contrast, challenges whether the plaintiff has sufficiently alleged subject matter jurisdiction in the complaint.  Id. at 1529.  When a defendant mounts a facial attack, the court must construe the complaint in the light most favorable to the plaintiff and accept all well-pled facts as true.  Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009); McElmurray v. Consol. Gov't of Augusta-Richmond County, 501 F.3d 1244, 1250, 1251 (11th Cir.2007) (noting in a Rule 12(b)(1) facial challenge a plaintiff has "safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised").  But when the attack is factual,

> the trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.  In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

Lawrence, 919 F.2d at 1529 (quoting Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir.), cert. denied, 454 U.S. 897, 102 S. Ct. 396, 70 L. Ed. 2d 212 (1981)).

Courts have deemed a motion seeking to compel arbitration as a factual attack as it asserts that a provision of an extrinsic document, an arbitration clause contained within the body of a contract, deprives the court of its power to adjudicate the plaintiff's claims. See e.g., Reineke v. Circuit City Stores, Inc., 2004 WL 442639, at *1 (N.D. Ill. Mar. 8, 2004) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)).  While no "presumptive truthfulness" attaches to the plaintiff's allegations in the context of a factual challenge, here the parties have only presented the allegations of the Amended Complaint and the Contract; thus, the Court will view them both as "true" for purposes of determining the arbitration issue.

A.

Congress enacted the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts . . . ." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 23, 111 S. Ct. 1647, 1652, 114 L. Ed. 2d 26 (1991).  Passage of the FAA evinced a "liberal federal policy favoring arbitration agreements." Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S. Ct. 927, 941, 74 L. Ed. 2d 765 (1983).  Judicial effectuation of this policy requires any doubts concerning the scope of arbitrable issues be resolved in favor of arbitration. Klay v. All Defendants, 389 F.3d 1191, 1201 (11th Cir. 2004).

While the FAA expresses a federal preference for arbitration, Congress tailored the statute "to make arbitration agreements as enforceable as other contracts, but not more so." Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404 n. 12, 87 S. Ct. 1801, 1806 n. 12, 18 L. Ed. 2d 1270 (1967).  Thus, the FAA is subject to constraints.  A party seeking to stay proceedings

under section 3 or to compel arbitration under section 4 must demonstrate that "(a) the plaintiff entered into a written arbitration agreement that is enforceable 'under ordinary state-law' contract principles and (b) the claims before the court fall within the scope of that agreement." Lambert v. Austin Ind., 544 F.3d 1192, 1195 (11th Cir. 2008). The need for such a showing follows from the bedrock axiom that "a party seeking to substitute an arbitral forum for a judicial forum must show, at a bare minimum, that the protagonists have agreed to arbitrate some claims." McCarthy v. Azure, 22 F.3d 351, 354–55 (1st Cir. 1994).

Additionally, the FAA exempts from coverage certain employment contracts pertaining to workers engaged in interstate commerce. Section 1 provides that the FAA is inapplicable to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1; see Hill v. Rent-A-Center, 398 F.3d 1286, 1289 (11th Cir. 2005) (stating the general view that Congress exempted claims of transportation workers from the FAA because it intended to enact legislation addressing the special circumstances of workers transporting goods in interstate commerce).

The parties here do not dispute the validity of the arbitration agreement; rather, they disagree over whether the arbitration clause reaches Bell's § 1981 claim. They also disagree whether the 9 U.S.C. § 1 exemption applies to the Contract, thereby rendering the arbitration clause unenforceable vis à vis Bell.

B.

Bell claims that he, as an owner/operator of a truck used to transport goods across state lines, falls within the section 1 definition of "other class of workers engaged in foreign or interstate commerce." He further claims that the Contract, although titled "Independent

Contractor Agreement," is a "contract of employment" as contemplated by section 1.  For its part, Atlantic Trucking does not contest Bell's assertion that he falls within the class of workers engaged in interstate commerce.  Instead, it argues that the Contract is not a "contract of employment" and, therefore, the section 1 exemption does not apply.  See Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 119, 121 S. Ct. 1302, 149 L. Ed. 2d 234 (2001) ("Section 1 exempts from the FAA only contracts of employment of transportation workers.").[2]

The FAA affords scant guidance on defining an exempted employment relationship.  Some courts have resolved the conundrum by looking to the general body of federal law governing motor carriers.  However, this approach has splintered the few courts employing it.  Compare Gagnon v. Service Trucking, Inc., 266 F. Supp. 2d 1361 (M.D. Fla. 2003) (finding that by operation of federal law [49 U.S.C. § 14102(a) and 49 C.F.R. § 376.12(c)(1)] a statutory employer-employee relationship exists between truck drivers and motor carriers for purposes of section 1 of the FAA and holding that truck driver was an "employee" and exempt from compulsory arbitration); Owner-Operator Indep. Drivers Assoc. v. Landstar System, Inc., 2003 WL 23941713 *2 (M.D. Fla. Sept. 30, 2003) (same); with Davis v. Larson Moving & Storage Co., 2008 WL 4755835 *5 (D. Minn. Oct. 27, 2008) (rejecting Gagnon on grounds that it failed to consider 49 U.S.C. § 376.12(c)(4), which provides that "[a]n independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. § 14102 and attendant administrative requirements."); Owner-Operator Indep. Drivers Assoc. v. United Van Lines, 2006 WL 5003366 *3 n. 3 (E.D. Mo. Nov. 15, 2006) (same).

---

[2] The Contract's title and terminology may be considered, but are not dispositive. See Wolf v. Coca-Cola Co., 200 F.3d 1337, 1340 (11th Cir. 2000).

Assuming, without deciding, that the categorical approach of Gagnon is suspect, the Court looks to the common law of agency to analyze whether Bell is an independent contractor or an employee.  See Clackamas Gastroenterology Assocs. v. Wells, 538 U.S. 440, 448 123 S. Ct. 1673, 1679, 155 L. Ed. 2d 615 (2004) (concluding that "the common law's definition of the master-servant relationship" provides helpful guidance in determining whether an individual is an "employee" who may invoke the protections of the ADA); Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 324, 112 S. Ct. 1344, 1350, 117 L. Ed. 2d 581 (1992) (finding in an ERISA action that when a statute refers to the term "employee" without defining it, the common law agency test should apply); Cilecek v. Inova Health Sys. Servs., 115 F.3d 256 259 (4th Cir. 1997) (stating in context of Title VII action that "[i]t now appears to be settled that when Congress uses the term "employee" in a statute without defining it, the courts will presume that Congress intended to describe "the conventional master-servant relationship as understood by common-law agency doctrine."); Speen v. Crown Clothing Corp., 102 F.3d 625, 631 (1st Cir. 1996) (applying common law agency test to determine whether person qualified as an "employee" under the ADEA); Daughtrey v. Honeywell, Inc., 3 F.3d 1488, 1492 (11th Cir. 1993) (following and applying Darden in ERISA action); Sprides v. Reinhardt, 613 F.2d 826, 831–32 (D.C. Cir. 1979) (applying common law agency test to define statutory term "employee" as used in the Civil Service Act, 5 U.S.C. § 2105(a)); Gagnon, 266 F. Supp. 2d at 1365–66 & n. 18 (citing Judy v. Tri-State Motor Transit Co., 844 F.2d 1496, 1505–06 (11th Cir.1988), and applying, as an alternative rationale, common law agency principles to determine applicability of section 1 exemption).[3]

---

[3] Atlantic Trucking contends that the question of whether Bell is an employee or independent contractor for purposes of the FAA is a question of state, rather than federal,

The traditional common law agency test focuses primarily on the "hiring party's right to control the manner and means by which the product is accomplished." Comm. for Creative Non-Violence v. Reid, 490 U.S. 730, 751, 109 S. Ct. 2166, 2178, 104 L. Ed. 2d 811 (1989); see also Radio City Music Hall Corp. v. United States, 135 F.2d 715, 717 (2d Cir. 1943) (stating that the law of agency looks to "the degree to which the principal may intervene to control the details of the agent's performance . . . ."). Among the factors that may be considered in assessing this "right to control" are,

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; the tax treatment of the hired party.

---

law. As support for this position, it cites to Lambert v. Austin Ind., 544 F.3d 1192 (11th Cir. 2008). This reliance is misplaced. Lambert considered, in part, whether an agreement to arbitrate was illusory, and, therefore, inoperative. Id. at 1194. In deciding the issue, the court recognized that the question of whether the agreement was illusory, and whether the parties exchanged adequate consideration, was subject to state contract law. Id. at 1195. Lambert did not consider the issue presented in this case, which is whether the contract was an employment contract for purposes of section 1 of the FAA. And because the class of contract is essentially defined by whether Bell was an "employee," it seems clear, after examining Supreme Court precedent, that the question is governed by federal common law.
   Nevertheless, as Atlantic Trucking admitted during oral argument, whether the Court looks to the federal common law of agency or South Carolina's law of agency, South Carolina being the state listed in the contract's choice of law clause, the Court would be applying materially similar law. See Wilkinson v. Palmetto State Transp. Co., 382 S.C. 295, 299, 676 S.E.2d 700, 702 (2009) ("Under settled law, the determination of whether a claimant is an employee or independent contractor focuses on the issue of control, specifically whether the purported employer had the right to control the claimant in the performance of his work. In evaluating the right of control, the Court examines four factors which serve as a means of analyzing the work relationship as a whole: (1) direct evidence of the right or exercise of control; (2) furnishing of equipment; (3) method of payment; (4) right to fire." (citations omitted)).

9

Gagnon, 266 F. Supp. 2d at 1366 (citing Darden, 503 U.S. at 323, 112 S. Ct. at 1348); cf. Restatement (Second) of Agency § 220(2) (1958) (listing nonexhaustive criteria for identifying master-servant relationship).  To be sure, the common law agency test contains "no shorthand formula or magic phrase that can be applied to find the answer, [thus] all of the incidents of the relationship must be assessed and weighed with no one factor being decisive."  Darden, 503 U.S. at 323, 112 S. Ct. at 1349 (citation and alteration omitted).  In appropriate cases, factors relating to an individual's economic dependence upon the hiring party may be taken into account.  See Roth v. American Hosp. Supply Corp., 965 F.2d 862, 867 (10th Cir. 1992); see also Hopkins v. Cornerstone America, 545 F.3d 338, 343 (5th Cir. 2008) ("To determine if a worker qualifies as an employee, we focus on whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself.").  In making its determination, the Court may look to the agreement between the parties, applicable federal laws and regulations governing interstate motor carriers, and the parties' course of conduct.  See NLRB v. A. Duie Pyle, Inc., 606 F.2d 379, 382 (3d Cir. 1979).

Viewing the text of the Contract and the allegations of the Amended Complaint, several facts indicate that Atlantic Trucking exerted a high degree of control over the manner and means by which Bell performed his job, suggesting the existence of an employer-employee relationship.  First, Atlantic Trucking is in the business of transporting goods; as such, Atlantic Trucking engaged Bell to perform its core business function.  Second, although Bell owned the truck used to complete his work, according to 49 U.S.C. § 14102, as implemented by 49 C.F.R. § 376.12(c)(1), motor carriers, such as Atlantic Trucking, assume control and responsibility for operating leased motor vehicles.  See Gagnon, 266 F. Supp. 2d at 1365.  Third, under the terms of the Contract, "all

10

bills of lading, waybills, freight bills, manifests, or other papers . . . shall indicate that the property transported is under the responsibility of [Atlantic Trucking]." Fourth, while the Contract provided that Bell possessed "the right to refuse acceptance of any particular shipment tendered," the Amended Complaint alleges that Bell was fired summarily because he attempted to exercise this very right.[4] Fifth, the Contract states that Atlantic Trucking could terminate the Contract for any reason by giving merely one day's notice.  Sixth, Atlantic Trucking could assign the Contract without Bell's consent, but he could not do likewise.  Finally, the Contract contains a covenant not to compete, according to which Bell agreed that "during the term of this [a]greement and for a period of one (1) year after termination of this [a]greement" he would not, in any capacity, "engage . . . in soliciting, transporting, or handling business of any customers of [Atlantic Trucking]."  In many respects, this provision, which is most typically found in employment contracts, seized much of Bell's economic independence and impeded his ability to realize additional income and profits through the exercise of his entrepreneurial skill and the ownership and maintenance of his equipment.  The non-compete provision, which inured exclusively to the benefit of Atlantic Trucking, belies the notion that Bell was an "independent contractor."  These factors, when assessed and weighed as a whole, militate in favor of finding an employment relationship.

Other aspects of the Contract, however, suggest that Bell enjoyed a level of freedom indicative of an independent contractor.  He owned the truck he used to transport shipments. Although the Amended Complaint alleges that Bell's freedom to refuse loads was illusory, the

---

[4] This fact also demonstrates Atlantic Trucking's unilateral ability to apply corrective and disciplinary measures, another factor relevant in the inquiry. See Pyle, 606 F.2d at 382.

Contract provides that after accepting a load he could choose the days and times of operations, select the routes to be traveled, and decide when and where to take rest stops and breaks. His autonomy also extended to selecting gas and oil stops and where to have his vehicle repaired. He was also responsible for paying all repair and maintenance expenses, use taxes, and other fees. He agreed to indemnify Allstate Trucking in certain circumstances. The Contract further provided that Bell would not be paid a salary but would be compensated a fixed amount for each job performed.[5]

While the Contract's title and some of its provisions signal that Bell was a true independent contractor, other provisions, particularly the non-compete clause and Atlantic Trucking's course of behavior, denominate Bell as an employee. After examining the limited record in this case, the Court concludes that, on balance, Bell has shown that he entered into a "contract of employment" for purposes of section 1 of the FAA and is thereby not subject to compulsory arbitration under the FAA.

### III.

For all the reasons stated above, it is **ORDERED**

1.   Defendant's Motion to Dismiss or, in the alternative, compel Arbitration (Doc. 8), is **DENIED**.[6]

---

[5] The Contract is silent with respect to whether Atlantic Trucking or Bell was responsible for tax withholding and the contract makes no mention of employee benefits, e.g., healthcare, long-term/short-term disability, etc.

[6] Because the Court has decided the motion based on the section 1 exemption, the Court need not reach Bell's alternative contention that his § 1981 claim is not subject to the arbitration agreement.

2.	No later than **January 8, 2010** defendants shall file and serve their answer(s) to the amended complaint and, by that same date, the parties shall file a case management report (the form of which is attached hereto).

**DONE AND ORDERED** at Jacksonville, Florida, this 7th day of December, 2009.

_____
TIMOTHY J. CORRIGAN
United States District Judge

jp
Copies to:

Counsel of Record

attachment:  CMR